Booker T. **SHEFFIELD,**
**Plaintiff/Appellee,**

v.

**SCHNEIDER SERVICES INTERNATIONAL, INC. and Continental Insurance Company, Defendants/Appellants.**

Supreme Court of Tennessee,
at Nashville.

Nov. 19, 1990.

Robert F. Hazard, Tullahoma, for plaintiff/appellee.

David Young Parker, Nashville, for defendants/appellants.

## OPINION

FONES, Justice.

Defendants appeal from an award of workers' compensation benefits, which included a 60 percent permanent partial disability of Plaintiff's right lower extremity and a 20 percent disability to the body as a whole, based upon an alleged injury to Plaintiff's chest.

It is not disputed that Plaintiff sustained an injury to his leg as a result of an injury at work on 23 October 1985. The major issue raised by Defendants is their contention that Plaintiff did not injure his chest in the work accident on 23 October, and that the episode of pneumonia and pleural effusion, that had its onset on 12 November 1985, had its origin in Plaintiff's preexisting sickle cell disease.

Plaintiff was employed as a laborer at the Arnold Air Force Base in Tullahoma, where his employer, Schneider Services International, was a contractor. A fiberglass condensate line required repair, behind the A & E Building. Plaintiff, two pipe fitters, and a backhoe with operator were dispatched to the site. A hole approximately nine and one-half feet by nine feet wide and five, six or seven feet deep was dug by the backhoe. The backhoe operator provided steps on one of the walls and when the pipe was appropriately exposed so that Plaintiff could complete preparation of the area for the pipe fitters to work, Plaintiff descended into the hole with his shovel. Shortly after he reached the bottom of the hole, a quantity of dirt on the wall behind him slid into the bottom of the hole and covered his right foot and leg, according to the backhoe operator, to the top of his four or five buckle galoshes. He was pushed forward and turned his upper body to look behind him, according to the witnesses, but was not knocked down and was able to pull his foot and leg out of the dirt and walk out of the hole without assistance. He said that his leg was hurting and Mr. Farris, one of the pipe fitters, drove him to the dispensary.

At the dispensary he was seen by Dr. Reynolds Fite, who recorded what Plaintiff told him had happened, as follows:

Employee states that he was behind the A & E Building working on a seven-foot deep ditch and the ditch started to cave in and employee jumped twisting his right knee.

Dr. Fite testified at the trial and said that Plaintiff did not complain of any other injury and the report that he filled out listed as the only complaint, "pain in right knee."

Dr. Fite sent Plaintiff to Harton Hospital by ambulance and arranged to have Plaintiff seen by Dr. Ramprasad, who specialized in orthopedics. Plaintiff gave the same history, that a ditch caved in and he had pain in the right knee and foot. X-rays showed there was, "a question of a fracture of the head of the fibula." Dr. Ramprasad treated Plaintiff conservatively with medication, rest and crutches, and had him return to his office on 28 October 1985, 1 November and 8 November. During this period Plaintiff did not work and lived with his sister. Dr. Ramprasad testified that on

the 8 November visit Plaintiff had no swelling, no tenderness and was able to walk without pain and he told Plaintiff that he could return to work on 11 November 1985.

However, Plaintiff did not return to work on that date. He testified that he was coughing, aching, his wind was short, his voice, "started to leave me," and he thought he was coming down with a cold. On 12 November 1985 he went to Dr. Jerry Kennedy's office in Tullahoma. After a brief examination, Dr. Kennedy took Plaintiff to Harton Hospital in Tullahoma and after further examinations, X-rays, etc., Plaintiff was sent to St. Thomas Hospital in Nashville. Dr. Kennedy did not testify. Plaintiff testified that Dr. Kennedy told him that they did not have the facilities at Harton Hospital to take care of his problem.

At St. Thomas Hospital Plaintiff was under the care of Dr. R.M. Rodriguez. At the time he saw Plaintiff he was board certified in internal medicine. Two years later, before he testified, he became board certified in internal medicine—pulmonary.

Dr. Rodriguez's initial report dated 12 November 1985, Exhibit 2 to his deposition, begins with the same history Plaintiff had given Drs. Fite and Ramprasad and the accident description portion ended with the following sentence: "He had no trauma to his chest." The report noted that hematology and laboratory data was "suggestive" of "hemoglobinopathies," and he *suspected* that his injury was unrelated to his acute pneumonia and pulmonary fluid and infection.

Dr. Fite testified that he was the company doctor and one of his primary duties was to tell the company whether or not its employees were able to work. The record also reveals that employees at the base are required to take periodic physical exams, probably annual. Plaintiff had worked at the base for 13 years and Dr. Fite had custody of Plaintiff's file containing his medical history. He testified that Plaintiff had sickle cell or hemoglobin S and hemoglobin C disease; that both are genetically determined, abnormal hemoglobins; that hemoglobin S distorts the shape of the red

cell so that it is more easily plumped and hemolyzed; that hemoglobin C crystallizes easily and renders the cell more vulnerable to hemolysis or breakdown; that when S & C exist in the same patient the result is a more severe disease. He testified that Plaintiff had lost the vision in his right eye because the combination of the abnormal hemoglobins had caused proliferation of elements of the retina and hemorrhage. He also said that "it's been known for a good many years that patients with sickle-cell disease are more vulnerable to pneumonia." He was of the opinion to a reasonable degree of medical certainty that Plaintiff's episode of pneumonia and pleural effusion for which he was hospitalized at St. Thomas on 12 November 1985 was caused by sickle-cell-hemoglobin C disease.

Plaintiff was in St. Thomas Hospital from 12 November 1985 until 8 December. They placed tubes to drain the infected fluid that had collected between the lung tissue and the chest wall, the pleural space. However, they were unable to clear out all of the fluid until he was taken to the operating room where a thoracotomy was performed. That operation involved opening up the chest by prying ribs apart, but they succeeded in removing the fluid and clearing up the infection.

On 11 December 1985 Dr. Rodriguez wrote to Dr. Kennedy about the course of treatment that Plaintiff had received while under his care. He stated that Plaintiff, "had a peri-pneumonic effusion secondary to bacterial pneumonia. His sputum cultures and bronchial washings grew staph. aureus.—His anemia at the time of presentation was hemolytic in origin, most likely due to his SC disease."

Under date of 8 August 1986, Dr. Rodriguez wrote a letter, "TO WHOM IT MAY CONCERN" in regard to Plaintiff's hospitalization at St. Thomas, wherein he said, in part:

His history began approximately a week or so prior to admission to St. Thomas Hospital, at which time he had an accident while on the job. This accident resulted in injury to his leg and possible injury to his chest. This injury

may have also contributed to a subsequent effusion. He may have had a significant amount of pain located in his right hemothorax subsequent to his fall which resulted in splinting and therefore poor mobilization of secretions. If this is the case, he could have certainly developed pneumonia on that basis. Although this is all speculation, I suspect this was the mechanism of his effusion and pulmonary infiltrates. In this sense his fall was therefore responsible for his subsequent hospitalization and absence from work.

Dr. Rodriguez's "TO WHOM IT MAY CONCERN" letter of 8 August 1986 was the first indication from any source that Plaintiff claimed he had sustained an injury to his chest in the accident of 23 October 1986. Having incurred over $25,000 in medical expenses at St. Thomas Hospital he had ample motivation to do so.

Dr. Rodriguez's deposition was taken by Defendants on 7 April 1988. He steadfastly adhered to his statement in the 8 August letter that the etiology or cause of Plaintiff's episode of pneumonia and pleural effusion was never determined; that *if* he injured his chest he could have developed pneumonia, but that was, "all speculation."

Dr. Rodriguez was asked if Plaintiff has any disability and he responded as follows:

Pulmonary-wise I would not let a man with a hematocrit of 19% work. If you're asking me that, then yes, he couldn't go back to work with a hematocrit of 19. That's unrelated to his job, okay? But if you're asking me is he disabled regarding his lung, my answer would have to be, I don't think so, given his pulmonary functions test and his status at that time. But if you're asking me about his hematocrit and whether a man with a hematocrit of 19 can work, I say no, he cannot work with that hematocrit. But that's not job-related.

Thus, Plaintiff's treating physician for the pulmonary problems that he contends resulted from the 23 October accident was of the opinion that he had no disability causally related to that incident, if any chest injury occurred.

Plaintiff was treated for his knee and foot injury by Dr. Ramprasad until 21 August 1986. After Plaintiff's release from St. Thomas he returned to Dr. Ramprasad's office on 30 December 1985, 14 March, 1 August, 19 August and 21 August in 1986. Plaintiff testified that he told his lawyer that he wasn't getting any better "in my knees and my foot" and asked him if there was anybody else he could see.

The deposition of Dr. Robert M. Canon, who practices orthopedic surgery in Tullahoma, but is not board certified, was taken by Plaintiff. Dr. Canon testified that he saw Plaintiff on 3 March 1987, at which time Plaintiff told him that he was down in a hole eight feet deep, "when apparently there was a cave-in and he was buried with dirt and gravel. It fell on him and he was buried up to his chest, above his chest level. He suffered a crush injury to the—I have in my notes here the left, but it was actually the right side of his chest, his right knee and right ankle."

The first thing Dr. Canon did was X-ray his chest and found that Plaintiff had, "multiple healing rib fractures and there was evidence of new bone formation at these fractures." He was asked if Plaintiff's hospitalization for lung problems in November 1985 resulted from the ditch accident in October and he responded as follows:

To the best of my knowledge a crush injury that resulted in a hemopneumothorax and a secondary pneumonia or empyema, that's all related and would be a reason for the hospitalization and the surgery.

Dr. Canon was asked by Plaintiff's lawyer if the proof developed that Plaintiff sustained an injury to his chest, "as a result of crashing up against the ditch wall as opposed to being filled in would that change any of your opinions?" His response was, "no." Dr. Canon expressed the opinion that Plaintiff had a permanent partial disability to his right knee of 30 percent, plus 10 percent to his right foot or 40 percent to his right lower extremity, and a 5 percent permanent partial disability to the body as a whole resulting from dimin-

ished lung volume, fractures to the rib cage and atrophy of his chest muscles. Dr. Canon acknowledged that he was not a specialist or board certified in internal medicine or pulmonary diseases.

Plaintiff took the deposition of Dr. M.P. Le Grand of Huntsville, Alabama. Plaintiff was performing "light restricted work" for Defendant Schneider and he wanted to resume his regular duties. Dr. Fite was of the opinion that his pulmonary disease prevented his full performance, but Dr. Kennedy, on behalf of Plaintiff, thought that he could perform. Under the Union Contract that circumstance called for evaluation by a neutral physician, whose opinion would prevail. Dr. Le Grand was selected for that purpose and examined Plaintiff on 5 November 1987. Dr. Le Grand was asked to assume trauma to Plaintiff's chest at the time of the October 1985 accident and give his opinion whether the trauma caused the pleural effusion and pneumonia. His response was that if you make the assumption that he had a "substantial chest injury" the answer was, yes.

Defendants took the deposition of Dr. Calvin F. Fuhrmann, a practicing physician in Baltimore, Maryland, board certified in internal medicine and pulmonary medicine and a member of the faculty of John Hopkins University Medical School and University of Maryland Medical School. He examined the records relevant to Plaintiff's hospitalization at St. Thomas Hospital in November 1985 and the medical file on Plaintiff that Dr. Fite had going back to the early '70's.

Dr. Fuhrmann graduated from medical school in 1970 and described a portion of his experience as follows:

... I did my training, two years of my postdoctoral training were carried out at Johns Hopkins University. Johns Hopkins Hospital is located in the inner city of Baltimore and has a large black population. It is a tertiary care center and one of my professors, Dr. Sam Charache, C–H–A–R–A–C–H–E, is the world's leading authority on sickle cell disease and sickle cell and hemoglobinopathies.

As a result of that, we have concentrate—or see on a regular basis patients with these related illnesses. During my training as a lung specialist, I had to spend six months on the medical service at Johns Hopkins, and we would see regularly patients with these diseases admitted to the hospital with many different problems. So, I have not only first-hand exposure to this, but in the process of my training was exposed to one of the leading authorities in this area.

He testified that he was asked to evaluate the records supplied to him to determine whether there was a causal relationship between Mr. Sheffield's injury in October 1985 and his admission to the hospital for pneumonia and empyema.

The relevant excerpts of his testimony on that issue follow:

The diagnosis of his admission or diagnosis post-admission was that he developed pneumonia and empyema, e-m-p-y-e-m-a. That is a medical term that describes inflammation surrounding the lung in the area between the chest wall and the lung tissue itself. This is an area called the pleural space. Infection gets in that area and it's difficult to clear. He did not clear with the traditional methods, which is to place tubes from the outside in that area and it required surgery.

He also had other problems while he was in the hospital. He had high fevers and blood in his urine and elevated white blood cell count. And, it was noted that he had cysts on his kidneys and a number of other problems related to his underlying disease.

Mr. Sheffield is a known and diagnosed case of what's called SC disease. SC disease is one of the family of hemoglobinopathies. These are a series of unusual conditions inherited, in which the red blood cells are affected or their structure is such that they're subject to breakdown. And what I mean by that is that these normal red blood cells are very resilient and very tough. These red blood cells and in the case of Mr. Sheffield's condition, allows these cells to

breakdown under certain circumstances. The breaking down of these red cells has many consequences in the body and not the least of which are those associated with Mr. Sheffield's admission.

And it is most probable, in fact I'm quite certain that his admission to the hospital with pneumonia and subsequent empyema was as a result of his increased susceptibility to infection resulting from his SC disease. And it is my opinion, based on what I've been given to review, that I can find no relationship between his injury to the lateral aspect of his leg and his subsequent admission to the hospital for empyema and pneumonia.

\*   \*   \*   \*   \*   \*

Q. Would the fact that Mr. Sheffield suffers from hemoglobinopathy, sickle cell, SC, made him susceptible to severe infections and multiple pleural emboli?

A. That is—that's correct. Individuals with this condition, SC disease, and also the individual with SS disease or sickle, actually sickle cell disease have an unusual propensity to develop bacterial infections of the lung, of the brain, meningitis. They also develop, interestingly enough, other infections of the bones.

But in this case, the—I don't want to appear presumptuous, but this is a classic case in the sense the patient with known disease who develops a staphylococci pneumonia. The staphylococcus is a bacteria which is seen in this type of pneumonia. And unfortunately, that particular type of bacteria, which is a very serious one, leads to infection of the lung tissue.

When the infection is severe and the person is not able to fight the infection, frequently the infection will extend itself from the body of the lung tissue, from the actual lung tissue through. It actually, it's like an abscess. It points out instead of going up and instead of coughing a lot of mucus, the drainage occurs internally. When that occurs, you get pus, infection between the lung tissue and the chest wall. What that occurs, a condition known as empyema occurs.

Now, the empyema doesn't heal itself. It's like an abscess. It must be drained. In this man's case, he presented with these symptoms. He had staff growing in his sputum. He had staphylococcus growing in his sputum. His fever didn't clear. They kept working on him and finally they took an x-ray and actually did a CAT scan, which is a three dimensional scan, found there was fluid collected in there and they put a tube in. They put one tube in. Still didn't clear and what happens is that the fluid actually gets what we call blockaded. It sticks in one area and doesn't stick in the other. They stuck another chest tube in and that didn't work and finally here's a man's fever's gone up. He looks sick. He really was apparently quite toxic. They subsequently took him to the operating room and cleaned his whole thing out, actually opened his chest, cleaned it all out and put tubes in. And then subsequently, he improved and was discharged.

Q. What is the most medically plausible explanation for Mr. Sheffield's pulmonary problems?

A. With his known condition of SC disease, he developed a spontaneous infection of the lung, which led to the empyema of the lung and the problems he developed.

Dr. Fuhrmann's testimony about Plaintiff's claim that he fractured ribs in the 23 October accident follows:

Q. Doctor, if Mr. Sheffield's chest x-ray of March 21, 1985 revealed nothing of the development of fractures of the sixth rib or perhaps the seventh on the right side and his chest x-ray of on or about November 11, 1985 revealed nothing of the development of fractures of the sixth rib or perhaps the seventh on the right side, and it was not until his x-ray, chest x-ray of June 18, 1986 that x-rays for the first time revealed such fractures, would it be reasonable to assume then that such fractures occurred sometime after November 11, 1985 and before June 18, 1986?

A. Absolutely, the answer is yes.

Q. Doctor, is it common for ribs to be fractured as a result of chest surgery?

A. Yes, sir.

Q. If Mr. Sheffield was operated on his chest, surgery subsequent to November 11, 1985 and the fractured rib showed up for the first time on his chest x-ray in June of 1986, would this explain the fractures showing up in June of '86?

A. Yes, sir. The procedure in this case was a, which is known as a lateral thoracic procedure, the patient is bent over bean bag. The ribs are actually—the chest wall is cut and the ribs are actually stretched using an instrument that looks like a vice, reverse vice. They actually put it on the chest wall and crank it. And, it exerts a tremendous force on the chest wall as was needed in this case to spread the chest open. Because this man had a condition that required total observation of the lung.

So, the facts in this case clearly point to, in my estimation, that these subsequent fractures occurred as a result of his surgery, particularly in light of the fact that the previous x-rays and reports never mentioned the fractures.

Dr. Rodriguez's report of 12 November 1985 contains this single reference to Plaintiff's chest X-ray: "Chest x-ray revealed a right pleural effusion."

This cause of action arose after 1 July 1985 and is subject to *de novo* review in this Court accompanied by a presumption of the correctness of the findings of fact by the trial court, unless the preponderance of the evidence is otherwise. *Alley v. Consolidated Coal. Co.*, 699 S.W.2d 147 (1985).

■ There is not a single piece of evidence in this record, that carries any indicia of reliability, to support a finding that Plaintiff sustained any injury to his chest and it is *certain* that he did not sustain a *substantial* injury or *crash* against a wall of the ditch, or was buried above his chest level.

Plaintiff gave a description of the accident to three different doctors within three weeks of the accident and failed to mention any injury to his chest. When he entered the hospital with chest pains and pulmonary problems he was recorded as affirmatively denying any chest injury. The attempt to portray Plaintiff as having sustained fractured ribs in the October accident fails to attain the status of credible evidence in the face of chest X-rays at the time of his admission revealing only a right pleural effusion, Plaintiff's remarkable failure to express any symptoms of fractured ribs, and Dr. Fuhrmann's description of the operation and its propensity to fracture ribs. The description of the accident by the three eyewitnesses virtually rule out the possibility of a chest injury. Plaintiff's own description of the accident, until after his hospitalization failed to include "falling." In short, this Court finds that the preponderance of the evidence establishes that Plaintiff did not injure his chest on 23 October 1985 and that his pulmonary problems for which he was hospitalized on 12 November 1985 were caused by his sickle-cell disease.

■ Defendants also insist that Dr. Ramprasad's opinion that Plaintiff has no permanent disability in his right knee and right foot should prevail over Dr. Canon's evaluation, because, among other things, Dr. Ramprasad was Plaintiff's treating physician and Dr. Canon saw Plaintiff for the first time 17 months after the accident, and proceeded upon a patently false history given him by Plaintiff. However, the preponderance of the evidence supports Plaintiff's position that he sustained troublesome injuries to his right knee and right foot; that swelling and tenderness comes and goes and has done so over a long period of time and we are not disposed to disturb the trial court's awards for the injury to Plaintiff's right lower extremity.

This Court's reversal of the finding that Plaintiff's pulmonary problems were work related requires a remand for the purpose of adjusting the award of temporary total disability. Obviously, Plaintiff is entitled to temporary total disability caused by the injury to his knee and foot, and is not entitled to such benefits caused by his pulmonary condition. That determination cannot be made from the record before us.

Only those medical expenses attributable to the knee and foot injuries are compensable, and if the parties have any disagreement on that issue it should be submitted to the trial court.

Affirmed in part, reversed in part and remanded for further proceedings. Costs are adjudged one-half to Plaintiff and one-half to Defendants.

DROWOTA, C.J., and COOPER, O'BRIEN and DAUGHTREY, JJ., concur.